<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FELICIA CLAY and CHARLES BENNETT, <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN LOVE *et al.*, <br><br> Defendants. | Civil Action No. 23-03074 (GC) (JTQ) <br><br> <u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon Defendants Stephen Love, David Kelso, and the City of Asbury Park's Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56.  (ECF No. 37.)  Plaintiffs Felicia Clay and Charles Bennett opposed, and Defendants replied.  (ECF Nos. 44, 45.)  The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

I.      <u>**BACKGROUND**</u>

   A.      **Factual Background[1]**

      1.      ***Before the Subject Incident***

On the night of June 19, 2021, Plaintiffs went to Johnny Mac's House of Spirits in Asbury Park, New Jersey to celebrate their birthdays.  (ECF No. 37-3 ¶ 1; ECF No. 44A ¶ 1.)  Clay,

---

[1]      On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party."  *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (citation modified).  The

Bennett's sister-in-law, was at the bar for approximately two hours, and during that time, she consumed three to four beers. (ECF No. 37-3 ¶¶ 4-5; ECF No. 44A ¶¶ 4-5; ECF No 44-1 at 7.) [2] Bennett consumed approximately three beers and engaged in cocaine use while at the bar. (ECF No. 37-3 ¶ 6; ECF No. 44A ¶ 6.) Bennett testified that he was intoxicated. (ECF No. 37-3 ¶ 7; ECF No. 44A ¶ 7.)

After Plaintiffs left the bar with their friends, a loud confrontation occurred just before 2:30 a.m. between Plaintiffs' group and another group on Mattison Avenue. (ECF No. 37-3 ¶¶ 8, 11; ECF No. 44A ¶ 8, 11.) The confrontation was spurred by a comment a member of the other group made about Bennett's then-girlfriend. (ECF No. 37-3 ¶ 8; ECF No. 44A ¶ 8.) Defendant Stephen Love is an officer with the Asbury Park Police Department and observed the dispute. (ECF No. 37-3 ¶ 11; ECF No. 44A ¶ 11.) Officer Love was at the location because he was on an employment detail at the intersection of Mattison Avenue and Main Street, during which he was tasked with enforcing Asbury Park ordinances and curtailing noise in the business and residential areas. (ECF No. 37-3 ¶¶ 9-10; ECF No. 44A ¶¶ 9-11.)

Officer Love advised the other group to leave, and the group complied. (ECF No. 37-3 ¶ 12; ECF No. 44A ¶ 12.) Officer Love also advised Plaintiffs' group to leave several times. (ECF

---

factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. Defendants' Statement of Undisputed Material Facts is at ECF No. 37-3, Plaintiffs' Response to Defendants' Statement of Material Facts and Statement of Additional Material Facts is at ECF No. 44, and Defendants' Response to Plaintiffs' Additional Material Facts is at ECF No. 45-1. Because Plaintiffs' Response to Defendants' Statement of Material Facts and Statement of Additional Material Facts are both at ECF No. 44 and both begin with Paragraph 1, when the Court refers to the former it will cite to ECF No. 44A and when it cites to the latter it will cite to ECF No. 44B. Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

[2]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

No. 37-3 ¶ 13; ECF No. 44A ¶ 13.)  But they did not leave and continued to "yell and scream." (ECF No. 44-5 at 9.)

One member of Plaintiffs' group, Zachary Zukowski, moved his hands towards Officer Love, and Officer Love ordered Zukowski to move his hands away.  (ECF No. 37-3 ¶ 14; ECF No. 44A ¶ 14.)  Zukowski ignored the command and instead continued to place his hands in front of Officer Love, and Zukowski yelled "get the fuck out of here."  (ECF No. 37-3 ¶15; ECF No. 44A ¶ 15.)  Officer Love thereafter arrested Zukowski and began to transport him by foot to the Asbury Park Police Headquarters across the street.  (ECF No. 37-3 ¶¶ 16, 18; ECF No. 44A ¶¶ 16, 18.)

### 2.    The Subject Incident

Plaintiffs and the remainder of their group, amounting to approximately six individuals, followed Officer Love as he walked Zukowski down Mattison Avenue to where it intersected with Main Street and the police headquarters.  (ECF No. 37-3 ¶¶ 19, 24; ECF No. 44A ¶¶ 19, 24.)  The group questioned why Zukowski was being arrested.  (ECF No. 44B ¶ 7; ECF No. 45-1 ¶ 7.) Bennett began recording Officer Love with his cell phone.  (ECF No. 44B ¶ 9; ECF No. 45-1 ¶ 9.) Officer Love turned to the group, and Clay pointed at the officer and yelled "that's bullshit."  (ECF No. 37-3 ¶ 20; ECF No. 44A ¶ 20.)  Officer Love advised the group to back away, get in their cars, and pick Zukowski up at the police station, but Bennett replied: "Don't tell me what to do . . . arrest me too, go ahead, go ahead arrest me too."  (ECF No. 37-3 ¶ 22; ECF No. 44A ¶ 22; ECF No. 44-5 at 10.)  Officer Love responded: "My man, I'm going to tell you one more time to back away from me."  (ECF No. 37-3 ¶ 26; ECF No. 44A ¶ 26.)  Bennett, who is white, responded to Officer Love, who is Black: "you fucking racist cop."  (ECF No. 37-3 ¶ 27; ECF No. 37-10 at 4, 16; ECF No. 44A ¶ 27.)  Clay yelled to Officer Love that he was "abusing [his] fucking authority" by arresting Zukowski.  (ECF No. 37-3 ¶ 29; ECF No. 44A ¶ 29.)

3

Now at the intersection of Mattison Avenue and Main Street, Officer Love took a flashlight out from his pocket and signaled to two officers that he needed assistance.   (ECF No. 37-3 ¶ 31; ECF No. 44A ¶ 31; ECF No. 44-5 at 10.)  Clay, held back by another woman in the group, again told Officer Love that he was "abusing [his] fucking authority."  (ECF No. 37-3 ¶ 32; ECF No. 44A ¶ 32.)  Bennett walked closer to Officer Love and, referring to Clay, stated: "a Black woman is telling you that you are abusing your authority."  (ECF No. 37-3 ¶ 33; ECF No. 44A ¶ 33.)  Defendants submit that Officer Love could not retreat any further because his back was at the edge of the sidewalk at the intersection of Mattison Avenue and Main Street.  (ECF No. 37-3 ¶ 34.)  Plaintiffs deny that Officer Love was unable to retreat further.  (ECF No. 44A ¶ 34.)  The parties also dispute what happened next.  In support of their factual positions, the parties point primarily to video footage, witness reports, and deposition testimonies.  (*See* ECF No. 37-3 ¶¶ 36-38; ECF No. 44A ¶¶ 36-38.)

The parties submit five different videos of the incident from both police officer body cameras and witness cellphones.  (*See* ECF Nos. 37-11, 37-12, 37-13, 44-2A, 44-2B.[3])  The footage most clearly capturing the incident was filmed by a member of Plaintiffs' group, Deseanna Reagon.  (*See* ECF No. 44 at 10; ECF No. 44-2B.)  The video depicts that Bennett, who was unarmed and filming the incident with his cellphone in his right hand, approached Officer Love—who was holding a flashlight in his right hand and a hand-cuffed Zukowski in his left hand—and yelled "a Black women is telling you [that] you are abusing your authority."  (ECF No. 44-2B at 1:07-1:09.)  In response, Officer Love let go of Zukowski and lunged towards Bennett with his right hand, holding the flashlight.  (*Id.* at 1:09-1:10; *see also* ECF No. 37-11 at 1:41-1:42.)  Bennett appeared

---

[3]   Plaintiffs have sent two exhibits of cellphone video footage to the Court.  (*See* ECF No. 44-2.)  The Court refers to the first as ECF No. 44-2A and the second as ECF No. 44-2B.  When citing to video footage, the Court will refer to the time stamps in the videos.

to retreat from the sidewalk at the intersection of Mattison Avenue and Main Street and moved onto the intersection's crosswalk, and Officer Love followed him. (ECF No. 44-2B at 1:10-1:11.) The two got into an altercation on the crosswalk, and Officer Love struck Bennett in the neck or head with his flashlight. (*Id.* at 1:11-1:12.) Clay then ran onto the crosswalk, in what appeared to be an attempt to intervene. (*Id.* at 1:12-1:13.) Officer Love then struck Clay on the head with the flashlight. (*Id.* at 1:13-1:15; *see also* ECF No. 37-12 at 0:12-0:14; ECF No. 44-2A at 0:12-0:14.) Less than ten seconds elapsed from when Officer Love let go of Zukowski to when he struck Clay on the head with a flashlight. (*See* ECF No. 44-2B at 1:07-1:15.)

After Clay fell, other videos of the incident document that Officer Love continued to swat at Bennett with the flashlight; Bennett retreated but remained facing Officer Love, bouncing on his feet with his hands partially raised, and then Bennett fell backwards and was apprehended by Officer Love. (ECF No. 37-12 at 0:14-0:22; ECF No. 44-2A at 0:14-0:22.) At least four other officers then ran to the scene to assist Officer Love in fully apprehending Bennett. (ECF No. 37-13 at 0:20-1:20; *see also* ECF No. 37-3 ¶ 44; ECF No. 44A ¶ 44.)

Officer Love testified about the incident. He stated that Plaintiffs' group was following him as he walked Zukowski to the police station, cursing at him, and yelling racial insults. (ECF No. 37-9 at 11-12.) Officer Love testified that, as a result, he was afraid for his own safety. (*Id.* at 12.) He stated that both Plaintiffs attacked him and that he only swung the flashlight to protect himself. (ECF No. 37-9 at 8-9.) While he acknowledged that neither Plaintiff was holding a weapon, he could not confirm whether they had anything else in their hands because, according to Officer Love, his back was turned away from them. (*Id.* at 9.) With respect to Bennett, Officer Love testified that, on the sidewalk at the intersection of Mattison Avenue and Main Street, Bennett "came within four inches of [his] face, spit[] in [his] face and lung[ed] at [him]." (ECF No. 44-5

5

at 11.)  Officer Love testified that he then used the flashlight as a "blocking weapon," because he was being attacked, rather than as a "baton."  (ECF No. 37-9 at 10; *see also* ECF No. 44-5 at 11.)  According to Officer Love, Bennett first moved backwards and then started to run forwards at Officer Love with "his hands up like he wanted to fight."  (ECF No. 44-5 at 11.)  At that point, Officer Love started to chase Bennett.  (*Id.*)  Officer Love also saw Clay run up behind him, and he testified that she pushed him, grabbed him from behind, "attack[ed]," and struck him.  (ECF No. 37-9 at 10; ECF No. 44-5 at 11.)  Thus, Officer Love "swung back" with the flashlight to "get her off" of him.  (ECF No. 37-9 at 10; ECF No. 44-5 at 11.)[4]

Plaintiffs also gave deposition testimony.  Bennett acknowledged that he got "a little bit loud," "acted like a jerk," and said "some things [he] shouldn't have said" because he "had a couple of drinks."  (ECF No. 37-7 at 11.)[5]  But Bennett maintained that just because he "got a little bit to[o] loud, and got under [Officer Love's] skin," Officer Love did not have a right to strike him with a flashlight.  (*Id.* at 14.)  Bennett testified that while he did approach Officer Love and made a racial insult, he did not "try to attack him," "try to put [his] hands in [Officer Love's] face," "lunge toward him," or "threaten to attack him," and stated he was approximately five feet from Officer Love when Officer Love first lunged at him.  (*Id.* at 17.)  Bennett's testimony does not recount what transpired between the initial lunge on the sidewalk and Clay's intervention at the crosswalk.  (*See generally* ECF No. 37-7; ECF No. 44-1.)

---

[4]    Officer Love also testified about his background and training.  He stated that he was trained in understanding the circumstances under which applying deadly force would be permissible.  (ECF No. 44-5 at 7.)    In particular, he acknowledged that under the Asbury Park Police Department's Use of Force Policy, he was only permitted to use deadly force when faced with "extreme danger" to himself or to the public.  (*Id.*)  And he acknowledged that striking someone in the head with an object like a flashlight would constitute deadly force.  (*Id.*)

[5]    Bennett testified that on a scale of one to ten of how inebriated he was during the incident, with ten being the most inebriated, he was at a three.  (ECF No. 44-1 at 9.)

Clay, for her part, testified that Officer Love "attacked" Bennett after Bennett "called him racist." (ECF No. 37-6 at 9.) Clay feared for Bennett's safety, so she tried to intervene when Officer Love and Bennett were fighting on the crosswalk, at which point she was hit by the flashlight and fell to the ground. (*Id.*) A non-party witness, Matthew D'Auria, also testified about Clay's involvement. He stated that Clay "ran at the police officer" before she was struck in the head and that after Bennett was apprehended, Officer Love went over to Clay and apologized, noting that it was an accident. (ECF No. 37-14 at 5-6, 8.) Plaintiffs submit that D'Auria's testimony is inaccurate. (ECF No. 44A ¶¶ 49-55.)

Sergeant Gabriel Carasquillo, the officer in charge on the night of the incident, described witness footage he reviewed. (ECF No. 44B ¶ 13; ECF No. 45-1 ¶ 13.) In the memorandum published on the same date as the subject incident, Sergeant Carasquillo—recounting the events beginning from the altercation on the crosswalk—wrote that:

> PO Love is observed striking Bennett with his flashlight in what appears to be the top of the head. As Bennett continues to pull away PO Love attempts to strike him again, but instead strikes a female subject identified as Felicia Clay who was in close proximity to PO Love and Bennett. Clay is observed falling onto the ground PO Love continues going after Bennett. Bennett is observed attempting to back away from PO Love while on the east side sidewalk of the street and in between the crosswalk. PO Love is observed again striking Bennett with his right hand that contained the flashlight causing Bennett to fall to the ground. PO Love then attempts to place Bennett in handcuffs.

(ECF No. 44-1 at 17; *see also* ECF No. 44B ¶ 13; ECF No. 45-1 ¶ 13.)

### 3.    *After the Subject Incident*

Following the incident, Bennett was arrested for aggravated assault on a police officer, resisting arrest, obstructing the administration of law and possession of suspected cocaine, as he had a bag of cocaine in his possession at the time of arrest. (ECF No. 37-3 ¶ 56; ECF No. 37-15; ECF No. 44A ¶ 56.) Bennett ultimately pled guilty to obstruction of law and possession of

7

suspected cocaine on or about June 3, 2022, and he was given a three-year prison sentence.  (ECF No. 37-3 ¶ 57; ECF No. 37-15; ECF No. 44A ¶ 57.)  Clay was charged with aggravated assault and obstructing the administration of law, and she ultimately pled guilty to disorderly conduct and paid a $500 fine.  (ECF No. 37-3 ¶¶ 59-60; ECF No. 44A ¶¶ 59-60.)

Both Plaintiffs sought treatment at Jersey Shore Medical Center on the date of the incident.  (ECF No. 44B ¶¶ 18, 20; ECF No. 45-1 ¶¶ 18, 20.)  Bennett was diagnosed with a head injury, traumatic forehead hematoma, and a scalp contusion.  (ECF No. 44B ¶ 20; ECF No. 45-1 ¶ 20.)  Clay was diagnosed with a head injury, a left eyebrow hematoma, and abrasion.  (ECF No. 44B ¶ 18; ECF No. 45-1 ¶ 18.)  Clay also received treatment several days later at the Raritan Bay Medical Center, where she was diagnosed with dizziness, visual changes, and neck pain.  (ECF No. 44B ¶ 19; ECF No. 45-1 ¶ 19.)

On July 8, 2021, the Asbury Park Police Department notified the Monmouth County Prosecutor's Office about the June 19, 2021 incident.  (ECF No. 44-5 at 13.)  The Monmouth County Prosecutor's Office reviewed the incident footage and concluded that:

> While we are cognizant of the vulnerable position that Officer Love was in when he used mechanical force during this incident, being alone and taunted by an unruly, intoxicated, aggressive crowd, some of whom were making racist comments towards him, we do have some concerns with the force used.  The current [New Jersey] Attorney General's Use of Force Policy (revised June 2000) allows mechanical force to be used when an officer reasonably believes it is immediately necessary to overcome resistance directed at the officer, protect the officer from unlawful force, or effect an arrest.  While mechanical force may be used in these scenarios, officers are taught at the police academy that the head is a vulnerable area of the body and that strikes to the head with a comparable object, a baton, constitute *deadly force*.  Section 4.2 of the Attorney General's Use of Force Policy, effective the end of this year, now includes a clear prohibition on striking an individual in the head with an object unless deadly force is authorized.  Thus, while we do not believe there is sufficient evidence to pursue a criminal investigation into this use of force, there are issues that need to be addressed in an

internal affairs investigation that should result in, at a minimum, additional training for Officer Love on use of force and de-escalation.

(*Id.* at 13-14 (emphasis in original).)  Accordingly, the Monmouth County Prosecutor's Office referred the matter to the Asbury Park Police Department for an internal affairs investigation.  (*Id.* at 14.)

Asbury Park Detective Darrius Davis conducted the investigation and filed a report on August 12, 2022.  (ECF No. 44-5 at 15.)  He found that there were some "discrepancies in [Officer Love's] account," but agreed with Officer Love that at one point during the altercation "Bennett was aggressively backing away and swinging his hands at Officer Love as to strike him."  (*Id.* at 15-16.)  He also agreed that "Bennett . . . was clearly provoking him in to arresting him for disorderly conduct by continuously calling him racial slurs, yelling black man against the white boy[,] and putting his hands into the face of Officer Love and preventing a lawful arrest of Zukowski."  (*Id.* at 19.)  However, Detective Davis ultimately recommended that Officer Love be found in violation of the Asbury Park Police Department's Use of Force Policy.  (*Id.* at 21.)[6]

Lieutenant Eddy Raisin reviewed Detective Davis's report and, on August 31, 2022, concluded that an "investigation shall be Not Sustained for Excessive Force," but found Officer Love to have violated the Department's Use of Force Policy.  (*Id.* at 23; *see also* ECF No. 44B ¶¶ 21-22; ECF No. 45-1 ¶¶ 21-22.)[7]  Thus, Lieutenant Raisin imposed a written reprimand as well

---

[6]    The Asbury Park Police Department's Use of Force Policy follows the New Jersey Attorney General's Use of Force Policy.  (*See* ECF No. 44-1 at 10; ECF No. 44-5 at 7.)

[7]    The Use of Force Policy permits officers to utilize physical or mechanical force when they reasonably believe that the use of force is immediately necessary to protect themselves against the use of unlawful force by another person.  (ECF No. 37-3 ¶ 62; ECF No. 37-17 at 6; ECF No. 44A ¶ 62.)  The Policy further outlines that "[a]t no time will an officer be justified during a non-life-threatening situation to intentionally . . . [s]trike a suspect about the head, neck, face[,] back or groin."  (ECF No. 37-3 ¶ 63; ECF No. 37-17 at 6-7; ECF No. 44A ¶ 63.)

9

as "additional training on Use of Force and De-escalation." (ECF No. 44-5 at 23.) Lieutenant Raisin testified that Officer Love violated the Use of Force [P]olicy based in part on "[t]he way the flashlight was swung . . . towards the head of the subject and the sternum area." (ECF No. 37-19 at 5-6.) On October 17, 2022, Defendant David Kelso, the Chief of Police and final reviewer, approved Lieutenant Raisin's disciplinary findings. (ECF No. 44-5 at 23.) Officer Love did not appeal the disciplinary decision. (ECF No. 44B ¶ 22; ECF No. 45-1 ¶ 22.)

## B.     Procedural Background

On June 5, 2023, Plaintiffs filed a five-count Complaint in this Court. (ECF No. 1.) Plaintiffs assert excessive force and failure to intervene claims under 42 U.S.C. § 1983 against Officer Love (Counts One and Two); a supervisory liability claim under 42 U.S.C. § 1983 against Chief Kelso (Count Three); an unlawful policy, custom, practice, and inadequate training claim under 42 U.S.C. § 1983 against Chief Kelso and the City of Asbury Park (Count Four); and a violation of the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-1, *et seq.*, against Officer Love (Count Five). (*Id.* at 4-10.) [8] Plaintiffs seek compensatory and punitive damages, attorney's fees,

---

[8]     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. The Complaint does not specify whether the individual Defendants are being sued in their personal or official capacities. (*See generally* ECF No. 1.) However, "[a] claim asserted against a municipal government official in his or her official capacity is treated as a suit against the municipal entity itself." *Scanlon v. Lawson*, Civ. No. 20-3212, 2022 WL 1940420, at *3 (3d Cir. May 17, 2022). And "where claims against an officer in his official capacity are duplicative of claims against the municipality, those claims are properly dismissed as redundant." *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 131 (D.N.J. 2017) (collecting cases) (dismissing official capacity supervisory liability claim against individual officer); *see also Hernandez v. City of Patterson*, Civ. No. 22-6763, 2023 WL 6876008, at *1, *10 (D.N.J. Oct. 18, 2023) (dismissing official capacity excessive force claim against individual officer who "shoved [the] plaintiff in the chest multiple times" when "premised upon the same allegations as the municipal liability claims"). Accordingly, to the extent Plaintiffs' claims are asserted against the individual Defendants in their official capacities, those claims must be dismissed as redundant to Plaintiffs' claim against the City of Asbury Park in Count Four. The Court will therefore construe the Complaint as asserting claims against the individual Defendants in their personal capacities.

10

interests, and costs for each Count. (*Id*.) Following discovery, Defendants filed the instant Motion for Summary Judgment on January 30, 2026. (ECF No. 37.) [9] That Motion is fully briefed and pending before the Court.

## II.    **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). The Court must grant summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." *Roofer's*

---

[9]    As part of discovery, Defendants submitted an expert report. (ECF No. 37-20.) The parties dispute whether the report is admissible. (*See* ECF No. 44-6 at 18-20; ECF No. 45 at 17-18.) However, because the Court does not rely on the report, nor would the report affect the outcome of the Court's decision on Defendants' Motion, it need not address the admissibility issue.

*Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)).

## III.    DISCUSSION

### A.    Excessive Force Claims Under 42 U.S.C. §1983 (Count One) and the New Jersey Civil Rights Act (Count Five)

Defendants argue the excessive force claims against Officer Love must be dismissed on qualified immunity grounds because his conduct was objectively reasonable and he did not violate any clearly established right.  (ECF No. 37-2 at 10.)  Plaintiffs respond that Officer Love is not entitled to qualified immunity because whether Officer Love's actions were objectively reasonable must be decided by a jury, and Officer Love violated Plaintiffs' clearly established rights.  (ECF No. 44-6 at 7, 16.)[10]  For the reasons described below, the Court holds Officer Love is not entitled to qualified immunity.

"As the Supreme Court has noted, qualified immunity advances a policy of 'shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably.'" *James v. N.J. State Police*, 957 F.3d 165, 166 (3d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (citation modified).

A qualified immunity analysis entails a two-prong inquiry: first, "whether the facts that a plaintiff has . . .  shown make out a violation of a constitutional right," and second, "whether the

---

[10]    The parties agree that the New Jersey Civil Rights Act claims in Count Five rise and fall with the § 1983 excessive force claims in Count One.  (*See* ECF No. 37-2 at 10; ECF No. 44-6 at 17-18).  *See also Lozano v. New Jersey,* 9 F.4th 239, 244 (3d Cir. 2021) (noting courts "do not differentiate between [New Jersey Civil Rights Act] and § 1983 claims for purposes of qualified immunity" (citation modified)).

12

right at issue was 'clearly established' at the time of defendant's alleged misconduct." *James*, 957 F.3d at 168 (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015)).  "The officers bear the burden of persuasion under each prong." *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024).  The Court will address each prong in turn.  *See Pearson*, 555 U.S. at 236 ("[D]istrict courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.")

### 1.    *Violation of Constitutional Right*

"The right to be free from the use of excessive force has been recognized under the Fourth Amendment, which guarantees the right of citizens 'to be secure in their persons . . . against unreasonable . . . seizures.'"  *Anglemeyer*, 92 F.4th at 188 (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  "The question in excessive force cases is whether, under the totality of the circumstances, the officers actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citation modified).  Courts "analyze this question from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation modified).  And courts "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (citation modified).

When assessing whether an officers' actions are objectively reasonable, courts consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether [the plaintiff] is actively resisting arrest or attempting to evade arrest by flight," (4) "the physical injury to the plaintiff," (5) "the possibility that the persons subject to the police action are themselves violent or dangerous," (6) "the duration of the

13

action," (7) "whether the action takes place in the context of effecting an arrest," (8) "the possibility that the suspect may be armed," and (9) "the number of persons with whom the police officers must contend at one time." *Id.* at 188-89 (first quoting *Graham*, 490 U.S. at 396; and then quoting *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020)).

At summary judgment, the facts must be viewed "in the light most favorable to . . . the non-moving party." *Peroza-Benitez v. Smith*, 994 F.3d 157, 166-67 (3d Cir. 2021).  When one party's narrative of events is "blatantly contradicted by the record," including by video footage, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Ringgold v. Keller*, 608 F. App'x 102, 104 (3d Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Castellani v. City of Atl. City*, Civ. No. 13-5848, 2017 WL 3112820, at *8 (D.N.J. July 21, 2017) (finding reasonable jury could credit the plaintiff's testimony when it was not contradicted by video evidence) (quoting *Scott*, 550 U.S. at 380)).

Here, when viewed in the light most favorable to Plaintiffs, a reasonable jury could find that Officer Love used objectively unreasonable force against both Plaintiffs during the June 19, 2021 incident and therefore violated the Fourth Amendment.  The parties agree that after Zukowski was arrested, Plaintiffs and their group of approximately six followed Officer Love and protested Zukowski's arrest as Officer Love walked Zukowski to the police headquarters.  (ECF No. 37-3 ¶¶ 19, 24; ECF No. 44A ¶¶ 19, 24.)  And the parties agree that Officer Love told the group to leave the scene, but they did not; Bennett instead stated, "Don't tell me what to do . . . arrest me too, go ahead, go ahead arrest me too."  (ECF No. 37-3 ¶¶ 21-22; ECF No. 44A ¶¶ 21-22; ECF No. 44-5 at 10.)  It is also undisputed that Officer Love gave Bennett another warning to back away.  (ECF No. 37-3 ¶ 26; ECF No. 44A ¶ 26.)  Bennett then yelled: "you fucking racist cop," (ECF No. 37-3 ¶ 27; ECF No. 44A ¶ 27), and Clay yelled to Officer Love that he was "abusing [his] fucking

14

authority" by arresting Zukowski,  (ECF No. 37-3 ¶ 29; ECF No. 44A ¶ 29).  Still alone at this point, Officer Love took out his flashlight to signal for support from two police officers.  (ECF No. 37-3 ¶ 31; ECF No. 44A ¶ 31; ECF No. 44-5 at 10.)  It is undisputed that Clay again yelled to Officer Love that he was "abusing [his] fucking authority," (ECF No. 37-3 ¶ 32; ECF No. 44A ¶ 32), and Bennett, who was intoxicated, walked closer to Officer Love and yelled: "a Black woman is telling you that you are abusing your authority,"  (ECF No. 37-3 ¶ 33; ECF No. 44A ¶ 33).

From here, the parties' accounts and evidence diverge.  Defendants contend that Officer Love feared an attack was imminent.  (ECF No. 37-3 ¶¶ 36-38.)  Officer Love testified that Bennett—whom he knew was unarmed—came within four inches of him, spit in his face, and lunged at and attacked him, so Officer Love feared for his own safety.  (ECF No. 37-9 at 9, 11-12; ECF No. 44-5 at 11.)  In response, Officer Love testified that he put up his right hand, which he was using to hold the flashlight, in order to block Bennett's attack.  (ECF No. 44-5 at 11.)  Officer Love testified that Bennett first moved backwards, but then he ran towards Officer Love with hands up "like he wanted to fight," so Officer Love chased him.  (*Id.*)  Bennett, by contrast, contends that while he got "a little bit loud," "acted like a jerk," and moved towards Officer Love, he did not "attack" or "lunge" towards Officer Love and remained approximately five feet away before Officer Love lunged at him.  (ECF No. 37-7 at 11, 14, 17.)

Officer Love testified that after the initial altercation with Bennett spilled onto the crosswalk, Clay ran up behind him, grabbed him from behind, pushed, and struck him.  (ECF No. 37-9 at 10; ECF No. 44-5 at 11.)  According to Officer Love, he swung back to get her off of him. (ECF No. 37-9 at 10; ECF No. 44-5 at 11.)  Clay testified that she tried to intervene between Bennett and Officer Love on the crosswalk because she feared for Bennett's safety, but then she

15

was hit by the flashlight and fell to the ground. (ECF No. 37-6 at 9.) Clay does not mention grabbing or striking Officer Love from behind. (*See id.*) Sergeant Carrasquillo reviewed footage of the incident and wrote that Officer Love, after initially striking Bennett on the crosswalk, attempted to strike him again, but "instead strikes [Clay.]" (ECF No. 44-1 at 17.) According to bystander testimony, after Bennett was apprehended, Officer Love apologized to Clay and stated hitting her was an accident. (ECF No. 37-14 at 5-6, 8.)

The Court has reviewed the footage provided by the parties, (ECF Nos. 37-11, 37-12, 37-13, 44-2A, 44-2B), and for purposes of summary judgment, it must accept Plaintiffs' account to the extent it does not clearly conflict with the footage, *see Ringgold*, 608 F. App'x at 104 (accepting the plaintiff's "version of events [that] are [not] 'blatantly contradicted' by the footage" (quoting *Scott*, 550 U.S. at 380)).

And, based on the video footage and Plaintiffs' other evidence in the record, a reasonable jury could conclude that Bennett moved towards but did not lunge at or physically attack Officer Love in the first instance. Instead, under the video footage and Plaintiffs' version of the events, a reasonable jury could conclude Officer Love lunged at Bennett. And, a reasonable jury could conclude, after the initial lunge, Officer Love and Bennett fought on the crosswalk when Officer Love struck Bennett on the head with the flashlight. With respect to Clay, a reasonable jury could find that in the midst of the altercation between Officer Love and Bennett on the crosswalk, Officer Love saw Clay running towards him, and he hit her on the head with the flashlight as well.

Accepting this version as true, and considering the relevant factors in the light most favorable to Plaintiffs, a jury could find that Officer Love's use of force was not objectively reasonable under the totality of the circumstances. *See El*, 975 F.3d at 327; *Anglemeyer*, 92 F.4th at 184. In particular, with respect to Bennett, the crime of resisting arrest was not severe, Bennett

16

was not violent or dangerous in that he did not attack Officer Love in the first instance, and he was diagnosed with a head injury, traumatic forehead hematoma, and a scalp contusion.  With respect to Clay,[11] the crime of disorderly conduct was not severe, Clay was not violent or dangerous in that she too had not become physical with Officer Love before she was struck, and she suffered from dizziness, visual changes, and neck pain, and was diagnosed with a head injury, left eyebrow hematoma, and abrasion.[12]  Accordingly, a jury could conclude that Officer Love's conduct was objectively unreasonable in violation of the Fourth Amendment, so the Court will proceed to the second prong of the qualified immunity analysis.

### 2.     *Clearly Established Constitutional Right*

The Court next decides whether Officer Love has met his burden of showing that a "reasonable officer[] could not have known that [his] actions violated clearly established law." *Anglemeyer*, 92 F.4th at 191 (quoting *Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023)).  To determine whether a right was "clearly established," courts "must proceed by defining the right allegedly

---

[11]    Defendants argue that even if Officer Love's conduct was objectively unreasonable with respect to Clay, Plaintiffs have failed to establish a violation of the Fourth Amendment because no "seizure" occurred. (ECF No. 37-2 at 40 (quoting *Torres v. Madrid*, 592 U.S. 306, 309 (2021).)  In *Torres*, the Supreme Court held that "[a] seizure requires the use of force *with intent to restrain*." *Id.* at 317 (emphasis in original).  The intent must be analyzed from an objective point of view rather than from "the subjective motivations of police officers," and "[a]ccidental force will not qualify." *Id.*  Viewing the evidence in the light most favorable to Plaintiffs, as the Court must at this stage, the Court finds that by swatting his flashlight at Clay's head, Officer Love manifested an objective intent to subdue her.  (*See* ECF No. 44-2B at 1:13-1:15; *see also* ECF No. 37-9 at 10; ECF No. 37-12 at 0:12-0:14; ECF No. 44-2A at 0:12-0:14; ECF No. 44-5 at 11.)  Accordingly, Clay has satisfied the seizure requirement at this stage.

[12]    The Court recognizes that some factors do not weigh in favor of Plaintiffs.  For example, even under the version most favorable to Plaintiffs that is not contradicted by the video evidence, Bennett did resist arrest after Officer Love lunged towards him, Officer Love was outnumbered throughout the incident, and the larger incident unfolded somewhere between a "few tense and dangerous seconds" and "a few minutes." *See El v. City of Pittsburgh*, 975 F.3d 327, 337 (3d Cir. 2020).  Nonetheless, under the totality of the circumstances, a jury could still find that Officer Love's conduct was objectively unreasonable.

17

violated with a 'high degree of specificity' and then asking 'whether that right was clearly established at the time of its alleged violation.'" *Id.* (first quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); and then quoting *Mack*, 63 F.4th at 228). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (quoting *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 196 (3d Cir. 2021)).

To complete this inquiry, courts "first look to factually analogous precedents of the Supreme Court and the Third Circuit. Then, [they] examine persuasive authorities, such as . . . nonprecedential opinions and decisions from other Courts of Appeals. [Courts] may consider all relevant cases under this inquiry, not just those cited by the parties." *James*, 957 F.3d at 170*; see also Wesby,* 583 U.S. at 64 ("[Courts] need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." (citation modified)). "[I]n some exceptional cases[,] the 'violation [is] obvious' such that general statements of law may suffice to show that a right is 'clearly established,' even in the absence of factually analogous precedent." *Peroza-Benitez*, 994 F.3d at 166 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). For example, "[i]n the excessive force context, an 'obvious' case is one where the general statements of law articulated in *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985), provide the requisite notice." *Id.*[13]

---

[13]      "*Graham* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Peroza-Benitez v. Smith*, 994 F.3d 157, 166 n.4 (3d Cir. 2021) (citation modified).  And "*Garner* stands for the proposition that "deadly force may not be used unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* (citation modified).

18

The Court first defines the allegedly violated rights, based on the video evidence and Plaintiffs' version of the facts, with a "high degree of specificity." *Anglemeyer*, 92 F.4th at 191 (quoting *Wesby*, 583 U.S. at 63). As to Bennett: the Fourth Amendment right of an unarmed individual who is protesting another's arrest by yelling obscenities and racial insults at the arresting officer, disobeying the officer's command to leave the scene, and resisting arrest to be free from being hit on the head multiple times with a flashlight by the arresting officer. And as to Clay: the Fourth Amendment right of an unarmed individual running towards a police officer, who is involved in a physical altercation with another individual, to protect that individual or intervene on that individual's behalf to be free from being hit on the head with a flashlight by the officer.

Defendants offer several cases for the proposition that Officer Love did not violate a clearly established right with respect to Bennett or Clay. (*See* ECF No. 37-2 at 31-39.) Plaintiffs, who are represented by counsel, do not offer any cases for the proposition that Officer Love violated any clearly established rights. (*See* ECF No. 44-6 at 15-17.) And Plaintiffs define the rights violated at an improper "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). (*See* ECF No. 44-6 at 16 ("Defendant violated Plaintiffs' Fourth Amendment right to be free from unreasonable seizure by intentionally striking them in the head with a flashlight.").) Nonetheless, because courts "may consider all relevant cases under this inquiry, not just those cited by the parties," *James*, 957 F.3d at 170, the Court has surveyed the caselaw to determine whether a clearly established right existed as to either Plaintiff by June 19, 2021.

One potential analog in which a court found qualified immunity did not apply is *El v. City of Pittsburgh*, 975 F.3d 327 (3d Cir. 2020). There, a lieutenant in her vehicle observed two brothers leaving a store and suspected they were carrying synthetic marijuana purchased from the store. *El*, 975 F.3d at 331. The lieutenant drove up to the brothers, asked to speak to them, but they declined

19

and walked away. *Id.* She continued to follow them in her car and called two officers for backup. *Id.* She then got out of the car, approached the brothers, and asked them to sit down in front of a vacant storefront and provide identification. *Id.* One brother provided identification, and the other did not because he was a minor without proof. *Id.* at 331-32. Backup arrived, and the lieutenant picked up the older brother's identification from the ground, looked at it, and tossed it back on the ground. *Id.* The younger brother reached for the identification, but the lieutenant stomped on it, preventing him from picking it up. *Id.* The brothers complained they were being harassed. *Id.* One of the two backup officers asked, "[D]o you want to know what it feels like to be harassed?" *Id.* The older brother then stood up and took "one or two small steps" towards the officer. *Id.* In response, the officer grabbed the older brother by the wrist and neck and slammed him into the wall and onto the pavement. *Id.* The younger brother stood up and attempted to punch the officer who slammed his brother, but he was tasered by the second backup officer. *Id.* The brothers laid on the ground, did not resist arrest, and six officers later handcuffed them. *Id.* They were treated at hospitals and charged with disorderly conduct and harassment. *Id.*

The § 1983 excessive force claims made against both officers were dismissed by the district court; the dismissal of the claim against the officer who tased the younger brother was not challenged but the claim against the officer who slammed the older brother to the ground was appealed to the Third Circuit. *Id.* at 333. The Third Circuit held that persuasive authority from sister circuits established that, in the specific context of "non-deadly force on unarmed, uncooperative citizens who are not suspected of serious crimes," an individual "has the right not to be taken to the ground during an investigatory stop when he stands up and takes one or two small steps towards a police officer who is standing a few feet away." *Id.* at 339 (collecting cases). As the court elaborated, "an unarmed individual who is not suspected of a serious crime—

20

including one who is verbally uncooperative or passively resists the police—has the right not to be subject to physical force such as being grabbed, dragged, or taken down." *Id.* at 340.

Here, while Plaintiffs' conduct may have been more extreme than the older brother in *El*, Officer Love was still presented with two unarmed individuals who were not suspected of violent crimes at the time of the incident, even if they were uncooperative and one of them was resisting arrest. And while *El* involved non-deadly force, Defendants concede that Officer Love used lethal force. (*See* ECF No. 37-2 at 29 (Defendants contending that "Officer Love was justified in utilizing deadly force").)[14] If Officer Love's actions violated a clearly established right had he applied non-lethal force, as in *El*, then surely—under Plaintiffs' version of the facts that do not contradict the video evidence—he has violated a clearly established right for using deadly force under the same set of circumstances. *See El*, 975 F.3d at 339, 341 ("We have concluded that cases are obvious, and that general standards clearly establish a right, in extreme situations such as when lethal force is used[.]"). In other words, the Court does not find Plaintiffs' offensive behavior rises to the level that a reasonable officer would not have known that deadly force was unwarranted and contrary to the Fourth Amendment. Thus, Officer Love has not satisfied his burden of providing the defense of qualified immunity. Accordingly, summary judgment is denied as to Counts One and Five.

---

[14]   This Court has previously analyzed force analogous to that used in the instant matter as lethal. *See Parnell v. Jackson Twp.*, Civ. No. 21-19326, 2024 WL 2767896, at *7 n.4 (D.N.J. May 30, 2024) ("[The defendants] acknowledged . . . that if [the p]laintiff's accusations are accepted, hitting [the p]laintiff in the head with a flashlight is . . . lethal force."). (*See also* ECF No. 44-5 at 7 (Officer Love confirming that "striking a person in the head with an object such as a flashlight or a baton would be an example of deadly force"); ECF No. 44-5 at 13-14 (Monmouth County Prosecutor's Office concluding that "officers are taught at the police academy that the head is a vulnerable area of the body and that strikes to the head with a comparable object [to a flashlight], a baton, constitute *deadly force*" (emphasis in original)).)

### B.    Failure to Intervene (Count Two), Supervisory Liability (Count Three), and Unlawful Policy and Failure to Train (Count Four) Under 42 U.S.C. § 1983

Defendants seek dismissal of Counts Two, Three, and Four.  (ECF No. 37-2 at 53-62.) Plaintiffs state that they "do not oppose" summary judgment on Counts Two and Four.  (ECF No. 44-6 at 5.)  While Plaintiffs do not explicitly concede Count Three, they fail to address Defendants' arguments on this Count, (ECF No. 37-2 at 55-57), and do not refer to the Count anywhere in their briefing, (*see generally* ECF No. 44-6).  When plaintiffs "fail[] to respond to [a] claim in opposition to [a d]efendant's summary judgment motion," they "waive[] any argument in support of its survival."  *Curtis v. City of Newark*, Civ. No. 19-17499, 2024 WL 3594329, at *5 (D.N.J. July 31, 2024) (granting summary judgment as to unopposed claim) (citing *Fischer v. G4S Secure Sols. USA, Inc.*, 614 F. App'x 87, 91 (3d Cir. 2015).[15]   Accordingly, the Court will dismiss Counts Two, Three, and Four.

---

[15]    Even if Plaintiffs had attempted to oppose summary judgment on the supervisory liability claim against Chief Kelso, any such opposition would be unavailing. "[T]wo theories of supervisory liability" are available under § 1983 upon a proper factual showing. *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (citation modified).  First, "supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm." *Id.* (citation modified).  Second, supervisors can be liable if "they participated in violating [a] plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violation." *Id.* (citation modified). The only evidence in the record concerning Chief Kelso is that he approved the disciplinary decision imposed on Officer Love. (*See* ECF No. 44-5 at 23.)  Such evidence, with nothing more, is insufficient to create a genuine dispute of material fact over whether Chief Kelso established a policy that caused a constitutional violation or had knowledge of and acquiesced in Officer Love's violation. *Santiago*, 629 F.3d at 129 n.5.

22

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, and other good cause shown, Defendants' Motion for Summary Judgment (ECF No. 37) is **GRANTED in part** and **DENIED in part**.  An appropriate Order follows.

Dated: July 14, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

23